UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

FOUR HUNDRED SIXTY THREE THOUSAND
FOUR HUNDRED NINETY SEVEN DOLLARS
AND SEVENTY TWO CENTS ($463,497.72)
IN U.S. CURRENCY FROM BEST BANK
ACCOUNT # XXX2677, NINETEEN
THOUSAND NINE HUNDRED THIRTY
SIX DOLLARS AND SEVENTY SEVEN
CENTS ($19,936.77) IN U.S. CURRENCY
FROM BEST BANK ACCOUNT # XXX8558,
ONE HUNDRED ONE THOUSAND FIVE
HUNDRED EIGHTY THREE DOLLARS
AND NINETY EIGHT CENTS ($101,583.98)
IN U.S. CURRENCY FROM COUNTRYWIDE
BANK ACCOUNT # XXX5890, NINETEEN
THOUSAND NINE HUNDRED EIGHTY SEVEN
DOLLARS AND SEVEN CENTS ($19,987.07)
IN U.S. CURRENCY FROM COMERICA BANK
ACCOUNT # XXX0766, BEST BUY BANK
ACCOUNT # 259207438, ONE HUNDRED ONE
THOUSAND SEVEN HUNDRED AND THREE
DOLLARS AND TEN CENTS ($101,703.10) IN
U.S. CURRENCY FROM COUNTRYWIDE
BANK ACCOUNT # XXX5890, NINETEEN
THOUSAND NINE HUNDRED TWELVE
DOLLARS AND SEVEN CENTS ($19,912.07)
IN U.S. CURRENCY FROM COMERICA BANK
ACCOUNT # XXX0766, FIFTY ONE THOUSAND
THREE HUNDRED SEVENTEEN DOLLARS AND
SIX CENTS ($51,317.06) IN U.S. DOLLARS FROM
COUNTRYWIDE BANK ACCOUNT # XXX7528,
and SAFESCRIPT PHARMACY # 19, LLC,

                Defendants,

and

Case No. 08-11564
Hon. David M. Lawson

**OPINION AND ORDER
DENYING  MOTIONS FOR
SUMMARY JUDGMENT AND
GRANTING IN PART AND
DENYING IN PART
GOVERNMENT'S MOTION
FOR DISCOVERY OR TO
STAY PROCEEDINGS**

STACEY HOGAN GIANOPLOS, RONALD G.
CARSON, and H.D. SMITH WHOLESALE DRUG
COMPANY, INC.,

               Claimants.

_____/

**OPINION AND ORDER DENYING H.D. SMITH'S AMENDED MOTION FOR
PARTIAL SUMMARY JUDGMENT, RONALD G. CARSON'S MOTION FOR
JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT, AND STACEY
HOGAN GIANOPLOS'S MOTION FOR JUDGMENT ON THE PLEADINGS
OR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING
IN PART GOVERNMENT'S MOTION FOR PROTECTIVE ORDER
OR TO STAY PROCEEDINGS, ESTABLISHING DISCOVERY DEADLINE,
AND ORDERING STATUS CONFERENCE**

The government commenced this asset forfeiture case against cash in bank accounts allegedly connected to the Safescript Pharmacy in Farmington Hills, Michigan, contending that it was proceeds from the illegal sale of controlled substances by pharmacy employees. The three claimants — Stacey Hogan Gianoplos, Ronald G. Carson, and H.D. Smith Wholesale Drug Company — contend that some of the money is not connected to the pharmacy operations, and all of them are innocent owners. They have filed motions for summary judgment, which were argued several months ago and have been pending for some time. Although some of the pharmacy employees have been prosecuted, the government sought additional time to develop a criminal case against others, and it argued that allowing the present matter to proceed would interfere with its intentions. No additional indictments have been forthcoming, however, and this matter must proceed. Fact issues that are apparent from the record in the case preclude summary judgment; therefore, the claimants' motions must be denied. The matter will be scheduled for trial. The Court will set a date to complete discovery, and grant in part the government's motion for a protective order.

-2-

## I.  Facts

### A.  The criminal activity

This *in rem* civil forfeiture proceeding is directed against five bank account defendants, totaling approximately $650,000.00.  The case was filed on April 11, 2008.  The FBI seized the funds two days earlier, on April 9, 2008.  Previously, on May 10, 2007, Drug Enforcement Administration (DEA) agents executed search warrants at the Safescript Pharmacy in Farmington Hills, Michigan.  The search of the pharmacy yielded 18 prescriptions on prescription pads of one Dr. Djamali, who, when questioned about the pads, denied ever writing or signing those prescriptions.  The pads contained an unassigned DEA number and the signature and contact information that were not Dr. Djamali's.  Investigation revealed that the prescriptions were presented by one George Scott, who would come to the pharmacy three times per week, sometimes twice a day, posing as an employee of a group home, and present various prescriptions for OxyContin or Methadone that were filled by Safescript's pharmacist Richard Riozzi.

On January 29, 2009, Riozzi was indicted, along with four other individuals — Sohrab Shafinia, D.O., Stuart Stein, Randell McDaniel, and Gerald Richards — on charges of distributing, controlled substances, including the Schedule II drug OxyContin.  The government alleged that Stein, McDaniel, and Richards paid Dr. Shafinia from $100 to $300 per occasion for prescribing a mixture of drugs containing OxyContin (the mixture that would later become known as the "Shafinia Cocktail") without examining or  sometimes even seeing the patients.  George Scott (who was charged with conspiracy to distribute controlled substance in a separate indictment) would then present these prescriptions to Richard Riozzi at the Safescript Pharmacy, and Riozzi would fill them without the patients being present.  Riozzi was paid around $400 per occasion.

Shafinia, Stein, Riozzi, McDaniel, and Scott eventually pleaded guilty to one or more counts of their respective indictments.

### B.  Allegations regarding Safescript, Gianoplos, and Carson

The Safescript Pharmacy in Farmington Hills is owned by Safescript Pharmacy # 19, LLC. Stacey Gianoplos is the resident agent.  She is also the wife of Ronald G. Carson, the resident agent of Safescript Pharmacies of Michigan, LLC, which is now defunct.  The government alleges that the seized assets belong either to Safescript Pharmacy, Gianoplos, or Carson and constitute or are derived from proceeds traceable to illegal distribution of controlled substances in violation of 21 U.S.C. § 841; use of a fictitious registration number in the distribution of controlled substances in violation of 21 U.S.C. § 843; or money laundering in violation of 18 U.S.C. § 1956.  Therefore, the government reasons, the assets are forfeitable under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A).

The government makes the following specific allegations with respect to each of the defendant accounts:

(1) *BestBank account ending in 2677 ($463,497.72) — Safescript's interest-bearing money market account (and its predecessor account ending in 0160, in the names of Safescript Pharmacy, Gianoplos, and Carson, closed on August 21, 2007).*  The government alleges that of the $703,210 deposited into this account, at least $400,000 represents proceeds from illegal sales of controlled substances.  As one example of the account's tie to illegal proceeds, the government contends that this account absorbed part of the cash Safescript earned in the illegal sale of controlled substances on May 9 and 11, 2007.  The deposits of cash from fraudulent prescriptions continued into the account after the predecessor account was closed.   During this same period, Scott paid cash for

illegal prescriptions. For example, on May 9 and May 11, 2007, Scott purchased 28 illegal prescriptions for approximately $39,200. On May 12, 2007, a cash deposit of $19,500 was made to Account Number *0160.  Bank records show similar transactions occurring frequently between February and May 2007.

The Michigan Automated Prescription Service (MAPS) data shows that on 29 separate days, approximately 333 prescriptions were filled using unassigned DEA number BD9374911; the government attributes the frequency to Scott's presentation fraudulent prescriptions filled by Riozzi. "Scott paid approximately $1,400 for each prescription or approximately $466,200 for 333 prescriptions." Am. Compl. ¶ 9(m). Safescript Pharmacy BestBank Account Number *0160 records show cash deposits made on or near the day of each transaction involving illegal prescriptions.  "In total, the cash deposited into the accounts amounts to $330,910."  *Ibid.*  During that same three month time period, Safescript's money market account number *2677 received cash deposits totaling $51,150.

(2) *BestBank account ending in 8558 ($19,936.77) — Safescript's checking account out of which payroll is paid.*  The government alleges that this account "received high dollar transfers from Best Bank Account Number *0160.  Since August 2007, this account received between 33% and 95% of its funds from transfers from Safescript Pharmacy BestBank Account Number *0160 and Safescript Pharmacy BestBank Account Number *2677.  The use of proceeds in the payroll account . . . , funded with [proceeds from unlawful drug sales], constitutes transactions involved in money laundering intended to promote the continued violations of the Controlled Substances Act."  Am. Compl. ¶ 9(n).

(3) *Countrywide Bank account ending in 5890 ($101,703.10) — Carson's interest-bearing savings account.* The government alleges: "Investigation reveals that there was an internet transfer of $100,000.00 from Best Bank Account Number *2677 to BestBank Account Number *8558. On October 16, 2007, a check made payable to Ronald G. Carson for $100,000.00 from BestBank Account Number *8558 was endorsed by Carson and deposited into BestBank Account Number *7438 on October 16, 2007. On or about October 19, 2007, Carson transferred $100,000.00 via wire transfer from BestBank Account Number *7438 to Countrywide Bank Account Number *5890. These transactions involved [illegal drug sales] proceeds and were intended to disguise and conceal the true nature and source of the [illegal drug sales] proceeds, and thus constituted money laundering." Am. Compl. ¶ 9(o).

(4) *Comerica Bank account ending in 0766 ($19,912.07) — Carson's personal checking account.* The government alleges: "Comerica Bank Account Number *0766 received deposits made payable to Carson amounting to $62,197.39 from BestBank Account Number *8558. The memo section indicates that the deposits were paychecks. However, Carson is not an employee of Safescript Pharmacy. He is married to Gianoplos, the owner of Safescript Pharmacy. In addition, Carson loaned $95,100.00 from this Comerica account and deposited $53,940.00 in interest and loan payments from Safescript Pharmacy into this account. These transactions involved [fraudulent drug sales] proceeds and were intended to disguise and conceal the true nature and source of the [fraudulent drug sales] proceeds, and thus constituted money laundering." Am. Compl. ¶ 9(p).

(5) *Countrywide Bank account ending in 7528 ($51,400.63) – Gianoplos and Carson's joint savings account.* The government alleges with respect to this account: "CountryWide Bank Account Number *7528 was opened on July 19, 2006 in the names of Carson and Gianoplos.

-7-

Between July, 2006, and November, 2007, $41,250.00 was deposited via wire transfer into this account from Comerica Bank Account Number *0766.  Some or all of these deposits constitute transactions involving fraudulent prescription sales proceeds involved in money laundering, to disguise their true nature and origin. . . ."  Am. Compl. ¶ 9(q).

The government has offered evidence through declarations by FBI analysts Patricia Rossiter and Wendy M. Freeman in support of its contention that at least some of the proceeds from unlawful drug sales went into Carson's bank accounts.  Rossiter's declaration states:

> Prior to completing the seizure affidavit, SA Rossiter identified, through investigation, review, and analysis, fraudulent prescriptions filled at Safescript Pharmacy # 19 LLC.  At least some of the fraudulent prescriptions were paid in cash. During review and analysis with FBI Financial Analyst (FA) Wendy M. Freeman, SA Rossiter and FA Freeman identified cash deposits into one or more of the above accounts subsequent to the fraudulent prescription activity.

Pl.'s Resp. to Carson's Mot. for Summ. J., Ex. 1, Rossiter Decl. ¶ 3.  Freeman avers that she traced the proceeds from illegal activities through each of the accounts, including the three that belong to Carson.  Pl.'s Resp. to Carson's Mot. for Summ. J., Ex. 2, Freeman Decl. ¶ 3.

### C.  Allegations regarding H.D. Smith

During the period from July 2004 to April 2008, Safescript Pharmacy # 19 purchased its pharmaceuticals and supplies from H.D. Smith Wholesale Drug Company, a national wholesaler of pharmaceuticals.  On June 16, 2006, Safescript # 19 entered into an agreement with H.D. Smith granting it a security interest in all of Safescript's collateral, wherever located.  The agreement secured all of Safescript's obligations to H.D. Smith, "including but not limited to, any balances owed for goods . . .  sold on credit by Secured Party to Debtor" and "all other amounts now or in the future owed by Debtor to Secured Party."  H.D. Smith's Am. Mot. for Partial Summ. J., Ex. A, Sec. Agreement ¶¶ 1.1, ¶ 1.2(ii), 1.2(v).  H.D. Smith perfected its security interest by filing a financing

statement (UCC-1 form) with the Michigan Secretary of State on June 21, 2006, and an amendment (UCC-3 form) on April 16, 2008.

The security agreement included an acceleration clause under which H.D. Smith could accelerate the balance of all Safescript's outstanding obligations in the event of default. Upon default, Safescript also became liable for costs and attorney's fees. Safescript's indebtedness accrues interest at 18% annually from May 31, 2008. When Safescript failed to pay for the drugs, H.D. Smith exercised its rights under agreement and presently is owed $544,322.29.

As a distributor of controlled substances in schedule I or II, H.D. Smith must report suspicious orders to the DEA. It appears that H.D. Smith "red-flagged" Safescript's orders twice, but rescinded both alerts based on its failure to consider the business model of the pharmacy. Daniel Roberts, H.D. Smith sales representative assigned the Safescript account, disclaimed knowledge of any suspicious activity, attributing the increase in drug sales to Safescript's decision to switch main providers, interruption in the supply of these drugs from other providers, and the niche market for the pharmacy surrounded by as many as ten pain clinics. In his affidavit, Roberts averred that Safescript's orders of drugs in the Oxy family were consistent with past usage by Safescript, and he actually expected an increase in sales to Safescript in the Spring of 2007. *See* H.D. Smith's Am. Mot. for Partial Summ. J., Ex. G, Daniel Roberts Aff. ¶¶ 12-16.

Carson and Gianoplos likewise deny any knowledge of the wrongdoing. The claimants rely on the innocent owner defense and ask the Court to sustain their claim to the funds.

The United States alleges that H.D. Smith, Carson, and Gianopolos were at least willfully blind to the wrongdoing, and fact issues preclude summary judgment in favor of the claimants as a matter of law. In support, the government relies on the affidavit of DEA investigator James

Rafalski, who averred that during the period from January 2006 to April 2008, H.D. Smith shipped to Safescript # 19 nearly ten times the amount of OxyContin and Oxycodone that it shipped to its next largest purchaser of these drugs serviced by H.D. Smith's Springfield, Illinois distribution center. *See* Pl.'s Br. in Resp. to H.D. Smith's Am. Mot. for Partial Summ. J., Ex. B, Rafalski Decl. ¶ 9 (orders for Safescript – 255,660 units; orders for next highest purchaser – 27,500); *see also* Pl.'s Br. in Resp. to H.D. Smith's Am. Mot. for Partial Summ. J., Ex. H, Suppl. Clarifying Decl. of Rafalski ¶ 5; Pl.'s Resp. to H.D. Smith's Mot. for Summ. J., Ex. F, Decl. of June E. Howard ¶ 6. The plaintiff summarized the orders of oxycodone 80 mg in January through August 2006 as follows:

| Month | Tablets |
|---|---|
| January 2006 | 1,800 |
| February 2006 | 2,000 |
| March 2006 | 3,700 |
| April 2006 | 1,000 |
| May 2006 | 1,800 |
| June 2006 | 2,600 |
| July 2006 | 3,900 |
| August 2006 | 5,400 |

Pl.'s Br. in Resp. to H.D. Smith's Am. Mot. for Partial Summ. J., Ex. B, Rafalski Decl. ¶ 6. Another increase in sales of OxyContin occurred in March-May of 2007, summarized as follows:

| Month | Tablets |
|-------|---------|
| January 2007 | 1,400 |
| February 2007 | 2,400 |
| March 2007 | 17,600 |
| April 2007 | 24,400 |
| May 2007 | 18,200 |
| June 2007 | 12,600 |
| July 2007 | 13,200 |
| August 2007 | 13,200 |
| September 2007 | 15,000 |
| October 2007 | 16,800 |
| November 2007 | 14,400 |
| December 2007 | 16,400 |

*Id.* ¶ 8.

In March and April of 2006 and in November of 2007, H.D. Smith filed a Suspicious Order Analysis Report to the DEA for orders from Safescript Pharmacy # 19, but each time proceeded to ship the orders to Safescript. *See id.* ¶¶ 5, 6, 8. During a scheduled regulatory investigation of H.D. Smith conducted by the DEA investigators from the Chicago Field Division in August and September 2006, the DEA questioned the effectiveness of H.D. Smith's suspicious order system "due [to] the human element and the potential for error caused by employee turnover." *Id.* ¶ 7; *see also id.*, Ex. E, Decl. of Scott M. Garriott ¶ 4; *id.*, Ex F, Decl. of June E. Howard.

-11-

### D.  Proceedings

The present action was filed by the government on April 11, 2008.  An amended complaint was filed May 2, 2008.  Ronald Carson and Stacey Gianoplos filed their answer and notice of claim on May 23, 2008.  Shortly thereafter, the government filed a motion to stay proceedings on May 29, 2008.  H.D. Smith filed its notice of claim on June 26, 2008.  On January 28, 2009, H.D. Smith filed its motion for summary judgment, followed by an amended motion for summary judgment on March 19, 2009.  On March 31, 2009, the Court entered an order staying discovery until June 1, 2009.  The government moved to extend the stay on May 29, 2009.  The Court entered an order denying a further stay on June 26, 2009.  Meanwhile, Carson filed a motion for summary judgment on June 11, 2009, and Gianoplos followed suit on June 30, 2009.  Finally, the government filed a motion for a protective order on October 8, 2009 to block the claimants from taking depositions of government agents and asking questions about an ongoing criminal investigation.  The government has maintained all along that it was pursuing others in connection with the illegal sales of prescription drugs at the Safescript Pharmacy, and more indictments were imminent.  The case has lain dormant for several months.  No additional indictments have been forthcoming.

### II.  Dispositive motions

H.D. Smith argues in its motion for summary judgment that, as the only creditor with a perfected security interest, it has a superior right to the collateral when compared to rights of the United States or other claimants; and it is entitled to the collateral because of a default in payment by Safescript and the operation of the acceleration clause in the security agreement.  H.D. Smith also argues that it is an innocent owner under the Civil Asset Forfeiture Reform Act of 2005 ("CAFRA"), 18 U.S.C. § 983 *et seq.*, because it did not have actual knowledge of wrongdoing.  According to

-12-

H.D. Smith, the owners of Safescript acknowledged that funds seized by the United States had been

set aside pending the wire transfer to H.D. Smith to pay down Safescript's secured indebtedness.

Carson and Gianoplos style their motions as motions for summary judgment or for judgment

on the pleadings.  Although they take issue with the amount of indebtedness owed to H.D. Smith,

they agree that as the secured creditor, H.D. Smith has a superior right to the funds.  Carson also

argues that he is an innocent owner under the Civil Asset Forfeiture Reform Act.  He contends that

the government has not provided any factual allegations that he and Gianoplos engaged in money

laundering or that the funds in the following three accounts were traceable to illegal activity:

> 1.  Comerica Bank *0766 ($19,912.07) — Carson's personal checking account;
> 2.  Countrywide Bank *5890 ($101,703.10) — Carson's interest-bearing savings account;
> 3.  Countrywide *7528 ($51,400.63) — savings account Carson maintained with his wife Stacey Gianoplos.

Carson explains that any transfers that occurred between his and Gianoplos's accounts were done

on advice of BestBank in order to maximize interest and reduce fees and the risk of loss from

employee theft, embezzlement, or identity theft.  He attached a letter from a banker in support of that

argument.  He also points to alternate sources for the funds in those accounts, and he maintains that

he performed services for Safescript Pharmacy for which he was paid.

Stacey Gianoplos also moved for summary judgment or judgment on the pleadings with

respect to the following accounts:

> 1.  BestBank account ending in 8558 ($19,912.07) — Safescript's checking account;
> 2.  BestBank account ending in 2677 ($463,497.72) — Safescript's interest-bearing Money Market account;
> 3.  Countrywide account ending in 7528 ($51,400.63) — Gianoplos and Carson's joint account that is also subject to Carson's motion.

-13-

She likewise asserts an innocent owner defense and disclaims all knowledge of Richard Riozzi's illegal scheme. She also alleges that George Scott, who filled the prescriptions, actively concealed his illegal activity from her. She furnished a declaration in support of her arguments.

### A. Motion standard

A motion for judgment on the pleadings or for summary judgment under Federal Rule of Civil Procedure 12(c) generally is reviewed under the standards that govern motions brought under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001). All parties have attached to their motion papers affidavits and documentary evidence that are not part of the pleadings. Because the parties have had notice and an opportunity to present their materials in support of their positions, the Court can and does convert the claimants' motions to summary judgment motions under Rule 56. *See* Fed. R. Civ. P. 12(d) (stating that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 571 (6th Cir. 2001) (stating that Rule 12(b) "empowers a district court to grant summary judgment *sua sponte* where the court is presented with materials outside the pleadings. . . . depend[ing] on the facts and circumstances of each case").

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

-14-

(1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must

make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the

-16-

crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"); *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992). In his commentary on affirmative motions for summary judgment, Judge William Schwarzer explains:

> When the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim–by showing that it would be entitled to a directed verdict at trial.

William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnote omitted).

## B.  Proof Requirements under CAFRA

Under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, the United States may claim by forfeiture "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Title II of the Act], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [Title II of the Act]."  21 U.S.C. § 881(a)(6).   Also subject to forfeiture is "[a]ny property . . . involved in a transaction or attempted transaction in violation of section 1956 . . . of this title [(laundering of monetary instruments)], or any property traceable to such property."  18 U.S.C. § 981(a)(1)(A).  The laundering of monetary instruments includes promotional money laundering, 18 U.S.C. § 1956(a)(1)(A)(i), and money laundering to disguise and conceal, 18 U.S.C. § 1956(a)(1)(B)(i).

Under the Civil Asset Forfeiture Reform Act (CAFRA), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). CAFRA imposes a higher burden of proof on the government than previously existed. Under the old standard, a showing of probable cause sufficed, and the claimant was required to prove non-forfeitability by a preponderance of evidence. *United States v. Real Prop. in Section 9*, 241 F.3d 796, 797 (6th Cir. 2001) (citing 19 U.S.C. § 1615 (1984)). The new standard was introduced to "level[] the playing field between the government and persons whose property has been seized" by raising "the government's burden of proof in civil forfeiture actions to the burden normally borne by the plaintiff in a civil case — preponderance of the evidence." *Id*. at 799. In addition, if the government alleges forfeitability based on a facilitation theory, "the Government [must] establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

"The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [jury] of the fact's existence." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring)) (quotation marks omitted). "That the burden is on the government does not change the fact that, if the government meets its burden, it will prevail unless the claimants introduce evidence to support their case." *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003).

-18-

"The government can acquire through forfeiture no greater interest than that held by the defendant at the time the criminal acts were committed." *United States v. Jones*, 502 F.3d 388, 392 (6th Cir. 2007). A perfected security interest in a business's assets may take priority over the government's claim to assets through forfeiture.

## C. Innocent Owner Defense

"An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). "With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place," an "innocent owner" is "an owner who — (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). "With respect to a property interest acquired after the conduct giving rise to forfeiture has taken place," an "innocent owner" includes one "who, at the time that person acquired the interest in the property — did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A)(ii). "The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1); *see also United States v. Lots 12, 13, 14, & 15*, 869 F.2d 942, 948 (6th Cir. 1989).

One court, parsing the statute, has observed that proof an innocent owner is "one who *either* lacks knowledge of the illicit activities giving rise to the forfeiture, *or* who has knowledge of the activity but has evinced his lack of consent by affirmatively attempting to stop it." *United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379, 1382 (S.D. Fla. 2003) (emphasis added). Most courts require actual, rather than constructive, knowledge of the

-19-

wrongdoing to rule out the defense.  *See United States v. $4,255,000 in U.S. Currency*, 762 F.2d 895, 906 (11th Cir. 1985) (holding that, under 21 U.S.C. § 881(a)(6), the application of the innocent owner defense "turns on the claimant's actual knowledge, not constructive knowledge"); *United States v. $10,694.00 in U.S. Currency*, 828 F.2d 233, 234-35 (4th Cir. 1987), *overruled on other grounds by United States v. Walker*, 889 F.2d 1317 (4th Cir. 1989)) (stating that "§ 881(a)(6) envisions an actual knowledge inquiry"); *United States v. Real Property at 2659 Roundhill Drive*, 283 F.3d 1146, 1152 n.8 (9th Cir. 2002) (requiring actual knowledge); *United States v. $175,260.00 in U.S. Currency*, 741 F. Supp. 45, 48 (E.D.N.Y. 1990) (same); *but see United States v. Real Property Located at 10936 Oak Run Circle*, 9 F.3d 74, 76 (9th Cir. 1993) (leaning towards a constructive-knowledge approach and holding that "innocence is incompatible with knowledge that puts the owner on notice that he should inquire further").  However, actual knowledge can be proven by circumstantial evidence.  *See One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d at 1383 (noting that a property owner "may not 'turn a blind eye' toward [evidence of drug involvement] and still claim 'innocent owner' status under CAFRA").

One modification CAFRA made to the civil forfeiture law's statutory text was the elimination of a specific reference to "willful blindness."  *Compare* 21 U.S.C. § 881(a)(4)(C) (1996) (establishing an innocent owner defense for an owner who could show that the underlying act was committed "without [his] knowledge, consent, or *willful blindness*" (emphasis added)) *with* 18 U.S.C. § 983(d)(2)-(3).  That has led courts to question whether the concept of willful blindness still exists in forfeiture cases.  *See One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d at 1382 ("It is unclear whether 'wilful blindness' of a property owner still operates as a facet of or equivalent to actual knowledge for purposes of defeating 'innocent owner' status under CAFRA.").  The Court

-20-

believes it does. As a general proposition, "a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact." *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000). Moreover, the courts that have considered the question have concluded that CAFRA did not eliminate willful blindness from the innocent owner analysis. *See, e.g., One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d at 1382-83; *cf. United States v. 2001 Honda Accord Ex VIN # 1HGCG22561A035829*, 245 F. Supp. 2d 602, 611 & n.8 (M.D. Pa. 2003) (noting that the innocent owner defense under CAFRA does not have a provision expressly mentioning willful blindness, but nevertheless applying pre-CAFRA willful blindness standard).

### D.  Discussion

#### 1.  H.D. Smith

H.D. Smith does not take issue with the fact that the accounts belonging to Safescript are subject to forfeiture. Rather, it claims that it has established that it is an innocent owner as a matter of law. As noted earlier, the claimant has the burden of proving that proposition. The Court finds that the government has come forward with sufficient facts to preclude summary judgment on that affirmative defense.

The government bases its allegation that H.D. Smith was willfully blind to Safescript's unlawful activities on two lines of evidence: (a) the lax attitude of Daniel Roberts, a sales representative dealing with Safescript, in monitoring the pharmacy's orders; and (b) the irregularities in Safescript's orders of controlled substances and H.D. Smith's failure to report excessive purchases of such substances.

The first line of argument is without merit. Daniel Roberts, H.D. Smith's sales representative who was solely responsible for Safescript's account, consistently denied having actual

-21-

knowledge or subjective suspicion of any nefarious activity at Safescript. Although he conceded that he did not specifically monitor the sales of controlled substances to Safescript, he explained that he did not consider it his task to do so. Therefore, he did not know about the spike in Safescript's orders of oxycodone around February 2007 or March 2007. And to the extent the government alleges he should have been alarmed by sizeable orders from Safescript from the beginning, Roberts's explanation — that he deemed the orders legitimate given the proximity of several pain clinics — is plausible. At most, Roberts might have been negligent in failing to inquire into Safescript's distribution of Schedule II and III drugs. However, a showing of negligence is not sufficient to support a finding of willful blindness. *See United States v. Hoffman*, 918 F.2d 44, 46-47 (6th Cir. 1990).

However, as a distributor of controlled substances, H.D. Smith was subject to the reporting and monitoring requirements of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* Under that Act, entities and individuals who manufacture, distribute, or dispense controlled substances must register with the Attorney General. 21 U.S.C. §§ 822-23. All registrants must maintain inventory records for the attorney general's inspection. 21 U.S.C. § 827(b). The Attorney General has delegated authority to grant, deny, revoke, or suspend registration to the DEA Administrator. 28 C.F.R. § 0.100(b). In addition, the Act requires manufacturers and distributors of controlled substances to "make periodic reports to the Attorney General of every sale, delivery or other disposal by him of any controlled substance." 21 U.S.C. § 827(d)(1). Those reports must include notification of suspicious orders of controlled substances, which requires manufacturers and distributors to monitor drug ordering traffic.

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field

> Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74(b). The reported information is collected in the Automation of Reports and Consolidated Orders System (ARCOS), which is a database that houses controlled substance activity as reported by DEA-registered manufacturers and distributors. Pl.'s Br. in Resp. to H.D. Smith's Am. Mot. for Partial Summ. J.. Ex. F, Decl. of June Howard at ¶ 2. ARCOS data can be used to verify sales of unusually large amounts of controlled substances. *Ibid.*

According to the declaration of DEA diversion investigator Kyle Wright, the DEA reminded the Director of Corporate Security at Safescript, George Euson, of the company's responsibilities under the Act during briefings on January 4, 2006 and October 10, 2007. The meetings were apparently conducted at the behest of H.D. Smith itself, after the company became concerned with the DEA's recent administrative actions against other drug distributors. The meetings included discussion of suspicious orders of three sample customers, whose sales of controlled substances were not consistent with legitimate pharmaceutical practices.

Yet, when H.D. Smith saw several spikes in Safescript's orders of controlled substances, it did not report all of them to the DEA as instructed. As noted earlier, spikes occurred in Safescript's purchases of oxycodone 80 mg in January through August 2006, and in sales of oxycontin in March through May 2007.

Although H.D. Smith filed a Suspicious Order Analysis Report in March and April 2006 and then again in November 2007, it did not file similar reports for other spikes in July or August 2006, April 2007, or other months when Safescript's orders of controlled substances increased dramatically. There was no explanation for spikes during these months, as with other periods when

-23-

another distributor may have lost a patent, compelling Safescript to buy all of its controlled substances from H.D. Smith.  In addition, even in the months when H.D. Smith did file its reports, it nevertheless proceeded to ship the orders to Safescript, contrary to the established protocol.  *See* Pl.'s Br. in Resp. to H.D. Smith's Am. Mot. for Partial Summ. J.. Ex. B, Rafalski Decl. ¶¶ 5, 6, 8.

Moreover, during the period from January 2006 to April 2008, H.D. Smith shipped to Safescript #19 nearly ten times the amount of OxyContin and Oxycodone that it shipped to its next largest purchaser of these drugs serviced by H.D. Smith's Springfield, Illinois distribution center. *See id.* ¶ 9; *see also id.*, Ex. H, Suppl. Clarifying Decl. of Rafalski ¶ 5; *id.*, Ex. F, Decl. of June E. Howard ¶ 6.  Yet, these numbers did not seem to alarm the distributor.

Based on this information, the Court cannot conclude as a matter of law that H.D. Smith was not willfully blind to unlawful activity at Safescript.  Therefore, the Court cannot conclude as a matter of law that H.D. Smith has sustained its burden of proof on this defense.

### 2. Gianoplos and Safescript Accounts

Best Bank account numbers *8558 containing $19,936.77 (Safescript's payroll account) and *2677 containing $463,497.72 were seized from Gianoplos and Safescript.  Gianoplos submits she "never observed any illegal activity at or involving Safescript."  Gianoplos's Mot. for Summ. J., Ex. 2, Gianoplos Decl. ¶ 13.  This declaration is contradicted by Riozzi's statements at his guilty plea hearing and FBI Agent White's sealed affidavit.  White's affidavit, however, contains only hearsay statements and cannot be used by the government to defeat a summary judgment motion. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

-24-

However, at his plea hearing, Riozzi stated that he had "reason to believe that the owners or people who had ownership interest in the pharmacy knew or had reason to believe that what [he] was doing . . . was illegal behavior," and that "members of management" were "usually present when the transactions, particularly the cash transactions were occurring."  Pl.'s Resp to Carson's and Gianoplos's Renewed Mot. for Summ. J., Ex. 1, Tr. Riozzi Plea Hr'g, at 17-19.  The question becomes one of credibility between Gianoplos and Riozzi that must be resolved by the fact finder; therefore, there is a genuine issue of material fact as to whether Gianoplos was willfully blind to the drug diversions by Riozzi and those that worked with him.  Gianoplos and Safescript are not entitled to summary judgment on account numbers *8558 or *2677.

### 3.  Carson's Accounts

Countrywide Bank account number *5890 containing $101,703.10 (Carson's savings account), Comerica Bank account number *0766 containing $19,912.07 (Carson's checking account), and Countrywide Bank account number *7528 containing $51,317.06 (Gianoplos and Carson's joint savings account) were seized from Carson.  He contends that his savings account was "opened . . . to earn higher interest rates.  [He] had learned of its 5.4% interest rate, higher than the rates offered by BestBank or anywhere else [he] could find.  The account also did not have the restrictions on withdrawals, nor did it charge for transfers."  Carson's and Gianoplos's Renewed Mot. for Summ. J., Ex. 3, Carson Decl. ¶ 11.  Likewise, Carson alleges that the $100,000 check he received on October 16, 2007 was

> a payment to [him] on the unpaid balance of the loan [he] gave [his] wife to help her start her business[.  She] transferred funds from the BestBank account number *2677[, Safescript's money market account] into the Safescript operating account in order to make that payment to [him] by check, following the very same procedure Safescript used for every other trade debt it serviced.  Furthermore, to avoid taking the already opened CountryWide Savings Link account beyond the $100,000.00

-25-

> maximum insurable limit, [he] deposited the funds into a second CountryWide Savings link in [his] own name to indicate separate and distinct ownership for a new and separate $100,000.00 to come within the limit then insured by the FDIC.
>
> On the advice of [his] bankers, [he] always tried to avoid having more than $100,000.00 in any single account as anything above that (at the time) would not be insured by the FDIC.

*Id.* ¶¶ 12-13. Carson also contends that he is an employee of Safescript "as evidenced by his 2006 and 2007 W-2s, previously filed as exhibits by Claimants in their Answer to the Amended Complaint." Carson's and Gianoplos's Renewed Mot. for Summ. J. ¶ 12.

However, as noted earlier, the government has furnished declarations by analysts Rossiter and Freeman showing that deposits into Carson's accounts were made after some of the fraudulent drug transactions, and the agents traced the proceeds from illegal activities through each of the accounts, including the three that belong to Carson.

These declarations are sufficient to create fact issues that preclude summary judgment in favor of Carson. A trial is required to resolve the dispute.

### III. Motion or Protective order

The government has filed a motion for a protective order to prevent the claimants from taking the depositions of the investigating agents and analysts and to resist the production of certain documents. The motion was provoked by a discovery request from Carson and Gianoplos for the following documents:

1. All Rule 11 plea bargain agreements;
2. All cooperation agreements;
3. All statements written or oral of each individual who has plead[ed] guilty or made statements in the ongoing criminal cases Nos. 09-cr-20039 and 09-cr-20021.
4. All documents, including but not limited to, correspondence reflecting any other agreements between the government and individuals.

5.      Copies of all oral and written statements made to or in the presence of any law enforcement officer, by or between the aforementioned individuals and any other person, or intercepted or overheard conversation to anyone, containing any and all information regarding the subject matter of the two criminal prosecutions referred to above.

Pl's Mot. for Protective Order [dkt #111], Ex. 1, Req. for Prod. at 1-2.  The documents were to be produced before the scheduled depositions of Patricia Rossiter and James Rafalski.  In the same motion, the government also renewed its request to stay the proceedings.

The documents requested by the claimants were directed at eight individuals indicted in the two related cases that were pending in this district before Judge Cook, including George Scott, Dr. Sohrab Shafinia, Richard Riozzi, Stuart Stein, Randell McDaniel, and Gerald Richards, as well as unnamed co-conspirators in the two criminal cases.  None of these individuals is a party in this civil forfeiture case, although many if not all of them likely will be witnesses.

The government argues that the plea bargain and cooperation agreements that the claimants requested for individuals indicted in the two criminal cases are under seal, the document requests for witness statements are improper because they would include grand jury evidence, and the balance of the requests would reveal information in the ongoing criminal investigation of Stacey Gianoplos and thereby impede the progress of the criminal investigation and impinge on Rafalski's and Rossiter's law enforcement privileges.  The government also argues that the documents in groups  4 and 5 are not related to the ongoing civil forfeiture case.

The Court has already elaborated on the standards for stay of forfeiture proceedings under 18 U.S.C. § 981(g), and the governing rules need not be repeated here.  *See* Opinion & Order Granting in Part Gov't's Mot. to Stay Proceedings [dkt. # 59]; *see also* Order Denying the Pl.'s Mot. to Extend the Stay of Civil Forfeiture Proceedings [dkt. # 86].  It is enough to note that CAFRA

-27-

authorizes a district court to stay proceedings "whenever a court determines that civil discovery will adversely affect the ability of the United States to investigate or prosecute a related criminal case." *United States v. GAF Financial Servs., Inc.*, 335 F. Supp. 2d 1371, 1373 (S.D. Fla. 2004); *see also* 18 U.S.C. § 981(g)(1) ("Upon the motion of the United States, the court shall stay the civil forfeiture proceeding if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case."). Section 981 also allows the Court to enter a protective order, but "[i]n no case . . . shall the court impose a protective order as an alternative to a stay if the effect of such protective order would be to allow one party to pursue discovery while the other party is substantially unable to do so." 18 U.S.C. § 981(g)(3).

The government has not presented any evidence that litigating the present matter and allowing discovery will interfere with an ongoing investigation or prosecution. The criminal cases against the defendants involved in the illegal drug diversions all are terminated by judgments or dismissals. The government has had its evidence of Stacy Gianoplos's involvement in the transactions for more than two years. The declarations cataloging the documentary evidence were filed in 2008 and 2009. Agent Alexander White filed a declaration under seal in which he described the debriefing of some of the criminal defendants in the now-closed cases, and that information has been available to the government for at least two years. If the government had a provable criminal case against Stacy Gianoplos or anyone else involved in the Safescripts transactions, it could have made a presentation to a grand jury by now. In all events, however, countenancing further delay and tying up substantial amounts of seized cash cannot be justified by the information furnished by the government to date. This case must proceed.

That does not mean, however, that the claimants are entitled to all the discovery they seek. Based on the government's representation, the Rule 11 plea agreements were placed under seal by Judge Cook. To unseal these materials, the claimants would have to petition Judge Cook, who is presiding over both of these cases to modify the terms of the sealing order. *Cf. Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159 (6th Cir. 1987) (endorsing the practice of intervening in the underlying case for the purpose of modifying a sealing order). In addition, the document requests are broad enough to encompass testimony by witnesses before the grand jury. Grand jury testimony is not subject to discovery. Fed. R. Crim. P. 6(e)(2)(B); *see also In re Grand Jury Subpoenas*, 454 F.3d 511, 521 (6th Cir. 2006) ("Grand jury secrecy is . . . a strong command . . . .").; *FDIC v. Ernst & Whinney*, 921 F.2d 83, 86 (6th Cir. 1990) (holding that "[t]he sanctity of the grand jury as a means of criminal investigation" is paramount even if the discovery of grand jury materials is being sought in a civil case).

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b). The scope of discovery under the Federal Rules of Civil Procedure is "quite broad." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). It is "broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." *Mellon v. Cooper-Jarrett, Inc.*, 424 F.2d 499, 501 (6th Cir. 1970). Even though all material obtained through discovery may not be offered or admitted at trial, "[m]utual knowledge of all the relevant facts . . . is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947).

The government invokes a "law enforcement investigatory privilege." This privilege exists where there is (1) "a formal claim of privilege by the head of the department having control over the requested information"; (2) an assertion of privilege is "based on actual personal consideration by that official"; and (3) "the information for which the privilege is claimed [is] specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). The privilege can apply to lesser-positioned officials such as the head of the appropriate regional division of the FDIC's supervisory personnel, head of the U.S. Army Criminal Investigation Command, FBI general counsel, or inspector general. *See Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (citations omitted). It has also been applied to prohibit disclosure of FBI agents' names and FBI's internal operating protocols. *Puerto Rico v. United States*, 490 F.3d 50, 70-71 (1st Cir. 2007). The law enforcement investigatory privilege applies with greater force to a request by a party in a civil suit to obtain materials from the government's criminal investigation. *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1124 (7th Cir. 1997).

"The burden of establishing the existence of the privilege rests with the party asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) (citing *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983)). The government's justification for refusing discovery parallels its request to stay the proceedings altogether. As noted above, that justification is unpersuasive.

In their motion papers, all parties have identified their respective discovery needs, and it is apparent that more time will be needed to ready the case for trial. But not much. Depositions of some of the actors have been taken already, and the government apparently completed its

investigation sufficiently to maintain successful prosecutions in two separate cases.  The Court will allow a limited time to complete discovery.

### IV.  Conclusion

The Court concludes that fact questions preclude summary judgment for the claimants. There is no basis to stay the proceedings any further.  The government's motion for a protective order will be granted in part and denied in part.  The parties must complete discovery.  A trial date will be scheduled following a status conference.

Accordingly, it is **ORDERED** that H.D. Smith's amended motion for partial summary judgment [dkt # 54], Ronald G. Carson's motion for judgment on the pleadings or summary judgment [dkt. # 80], and Stacey Hogan Gianoplos's motion for judgment on the pleadings or summary judgment [dkt. # 88], and Carson's and Gianoplos's renewed motion for summary judgment [dkt. #121] are **DENIED**.

It is further **ORDERED** that the government's motion for protective order or, in the alternative, for entry of stay [dkt. # 111] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the claimants may not obtain sealed documents in the criminal cases before Judge Cook in this district until they move successfully to unseal those documents; and the claimants may not obtain witness testimony presented to the grand jury.  The government's motion is denied in all other respects.

It is further **ORDERED** that the parties shall complete discovery by **May 31, 2011**.

It is further **ORDERED** that counsel for the parties appear before the Court on **April 20, 2011 at 2:30 p.m.** to discuss further case management deadlines and schedule the matter for trial.

s/David M. Lawson

-31-

DAVID M. LAWSON
United States District Judge

Dated:   March 24, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 24, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL