UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                         Plaintiff,

v.

FOUR HUNDRED SIXTY-THREE THOUSAND
FOUR HUNDRED NINETY-SEVEN DOLLARS
AND SEVENTY-TWO CENTS ($463,497.72)
IN U.S. CURRENCY FROM BEST BANK
ACCOUNT # XXX2677, NINETEEN
THOUSAND NINE HUNDRED THIRTY-
SIX DOLLARS AND SEVENTY-SEVEN
CENTS ($19,936.77) IN U.S. CURRENCY
FROM BEST BANK ACCOUNT # XXX8558,
ONE HUNDRED ONE THOUSAND FIVE
HUNDRED EIGHTY-THREE DOLLARS
AND NINETY-EIGHT CENTS ($101,583.98)
IN U.S. CURRENCY FROM COUNTRYWIDE
BANK ACCOUNT # XXX5890, NINETEEN
THOUSAND NINE HUNDRED EIGHTY-SEVEN
DOLLARS AND SEVEN CENTS ($19,987.07)
IN U.S. CURRENCY FROM COMERICA BANK
ACCOUNT # XXX0766, BEST BUY BANK
ACCOUNT # 259207438, ONE HUNDRED ONE
THOUSAND SEVEN HUNDRED AND THREE
DOLLARS AND TEN CENTS ($101,703.10) IN
U.S. CURRENCY FROM COUNTRYWIDE
BANK ACCOUNT # XXX5890, NINETEEN
THOUSAND NINE HUNDRED TWELVE
DOLLARS AND SEVEN CENTS ($19,912.07)
IN U.S. CURRENCY FROM COMERICA BANK
ACCOUNT # XXX0766, FIFTY-ONE THOUSAND
THREE HUNDRED SEVENTEEN DOLLARS AND
SIX CENTS ($51,317.06) IN U.S. DOLLARS FROM
COUNTRYWIDE BANK ACCOUNT # XXX7528,
and SAFESCRIPT PHARMACY # 19, LLC,

                         Defendants,

and

Case No. 08-11564
Honorable David M. Lawson

**OPINION**

STACEY HOGAN GIANOPLOS, RONALD G.
CARSON, and H.D. SMITH WHOLESALE DRUG
COMPANY, INC.,

                    Claimants.

_____/

## **OPINION**

The government commenced this asset forfeiture case against cash in bank accounts allegedly connected to the Safescript Pharmacy in Farmington Hills, Michigan, contending that it was proceeds from the illegal sale of controlled substances by pharmacy employees. Claims were filed by three claimants: Stacey Hogan Gianoplos, Ronald G. Carson, and H.D. Smith Wholesale Drug Company, Inc. A consent order was entered on May 23, 2011 disposing of the claims by Gianoplos and Carson and dismissing H.D. Smith's cross claims against them. The consent order also established that the money in the bank accounts is subject to forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A), but also subject to H.D. Smith's valid first priority lien as a secured creditor of Safescript. The parties agreed that a fact issue remains as to whether H.D. Smith is an innocent owner within the meaning of 18 U.S.C. § 983(d)(1) & (2)(A).

The case came on for trial before the Court without a jury on August 11 and 12, 2011. The Court heard the testimony of six witnesses in person and six by deposition, and received 52 exhibits. The parties also submitted several stipulations of fact that were incorporated in the joint final pretrial order. The parties filed post-trial briefs and proposed findings. The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), followed by its application of the governing law.

I. Facts

-2-

A.  Background

This *in rem* civil forfeiture proceeding was commenced by the United States on April 11, 2008 against five bank account defendants containing cash in the total amount of approximately $650,000.00.  The FBI seized the funds on April 10, 2008.  Since the seizure, the United States has maintained the funds previously contained in the Safescript bank accounts in the interest-bearing Seized Asset Fund, which, following a settlement distribution to other claimants, had a balance on July 27, 2011 of $606,450.29.  The seizure was part of an investigation into the activities of individuals associated with the Safescript Pharmacy in Farmington Hills, Michigan involving the diversion of Schedule II controlled substances into the illegal market.  Safescript was owned and operated by Stacey Hogan Gianoplos.  Ronald G. Carson was Gianoplos's husband and business partner.

Claimant H.D. Smith Wholesale Drug Company, Inc. was a pharmaceutical supplier to Safescript Pharmacy.  H.D. Smith sold pharmacy products, including controlled substances, to Safescript on account and had a perfected security interest in Safescript's collateral, which was defined by the security agreement to include identifiable cash proceeds in Safescript's bank accounts.  At the time the bank accounts were seized, Safescript owed H.D. Smith approximately $540,000 on account; the balance accrued interest at the contractual rate of 18% per year.

H.D. Smith filed a claim to the cash proceeds seized by the government, alleging that its security interest conferred ownership status to the funds and contending that it was an innocent owner of the funds within the meaning of 18 U.S.C. § 983(d).  As the issues were refined through this litigation, the parties have come to agree that the cash is subject to forfeiture and there is no evidence that employees of H.D Smith had actual knowledge that the controlled substances the

-3-

company supplied to Safescript Pharmacy were being diverted for unlawful purposes. However, the government contends that H.D. Smith was willfully blind to the illegal diversions, and that willful blindness disqualifies H.D. Smith from claiming innocent owner status.

The United States does not contest H.D. Smith's properly perfected and secured claim for the invoiced amounts for pharmaceuticals sold to Safescript through April 11, 2008. The government agrees that if H.D. Smith prevails on its innocent owner claim, it is entitled to all of the seized account proceeds (less $50,000 already returned to Gianoplos and Carson) together with interest earned while on deposit in the Seized Asset Fund. The fact issue presented at trial was whether H.D. Smith was willfully blind to the illegal diversions of controlled substances that were occurring at Safescript sometime before H.D. Smith terminated its relationship with Safescript on April 11, 2008.

The crux of the claimant's case is that it had in place reasonable measures to detect suspicious orders of controlled substances by its customers, and it had no reason to believe that the volume of orders for oxycodone and its branded equivalent, OxyContin, indicated that the drugs were destined for the illegal market. Therefore, the claimant reasons, it has sustained its burden that it is an innocent owner of the bank account proceeds subject to forfeiture. The government seeks to rebut that claim by proof that Safescript's purchases of oxycodone and OxyContin from January 2006 through April 2008 were so voluminous that H.D. Smith personnel should have investigated Safescript's purchasing and distribution activity and suspended shipments of the controlled substances. Its failure to do so, the government argues, amounts to deliberate action to avoid learning the true facts and amounts to willful blindness.

-4-

H.D. Smith is a national wholesaler of pharmaceuticals and a registrant supplier licensed by the Drug Enforcement Administration (DEA) to distribute controlled substances. H.D. Smith's license was and is currently in good standing with the DEA.

The responsibility to register wholesale drug distributors falls to the Attorney General. *See* 21 U.S.C. § 823(b). A license is issued if the Attorney General determines that the registration is consistent with "the public interest." *Ibid.* Among the factors the Attorney General must consider is whether the registrant "maint[ains] effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1).

To fulfill that congressional mandate, the Attorney General has promulgated rules for registrants. For instance, 21 C.F.R. § 1301.74(b) requires a registrant supplier to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." Registrants are required to disclose "suspicious orders" to the DEA field office. *Ibid.* "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Ibid.*

### B.  Illegal activity at Safescript

The DEA began investigating the activities at Safescript Pharmacy in 2006. The lead investigator was James Rafalski. The investigation eventually revealed that a Dr. Sohrab Shafinia was writing prescriptions for pain-killing narcotic drugs, including OxyContin and oxycondone, for no valid medical purpose. A "runner" named George Scott came to the Safescript pharmacy three times per week, sometimes twice a day, posing as an employee of a group home, and presented the prescriptions, which were filled by Safescript's pharmacist Richard Riozzi.

On January 29, 2009, Dr. Shafinia Riozzi was indicted, along with four other individuals, Richard Riozzi, Stuart Stein, Randell McDaniel, and Gerald Richards, on charges of distributing controlled substances, including the Schedule II drug OxyContin, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. The government alleged that Stein, McDaniel, and Richards paid Dr. Shafinia from $100 to $300 per occasion for prescribing a mixture of drugs containing OxyContin (the mixture that would later become known as the "Shafinia Cocktail") without examining or sometimes even seeing the patients. Some of the prescriptions also were for Lorcet, Lortab, Xanax, and Soma. George Scott (who was charged with conspiracy to distribute controlled substances in a separate indictment) would then present those prescriptions to Richard Riozzi at the Safescript Pharmacy, and Riozzi would fill them without the patients being present. Riozzi was paid around $400 per occasion. Neither Gianoplos nor Carson were indicted.

Shafinia, Stein, Riozzi, McDaniel, and Scott eventually pleaded guilty to one or more counts of their respective indictments. They have been sentenced to substantial prison terms. The government acknowledges that H.D. Smith had no actual knowledge of any of the criminal conduct that gave rise to the indictments at any time before learning of the seizure of the Gianoplos and Carson accounts on April 10, 2008 and the filing of the forfeiture complaint immediately thereafter on April 11, 2008.

### C.  *In rem* defendants

The bank accounts seized on April 10, 2008 consist of the following:

(1) *BestBank account ending in 2677 ($463,497.72) — Safescript's interest-bearing money market account (and its predecessor account ending in 0160, in the names of Safescript Pharmacy, Gianoplos, and Carson, closed on August 21, 2007).* The government alleges that of the $703,210 deposited into this account, at least $400,000 represents proceeds from illegal sales of controlled substances. The account absorbed part of the cash Safescript earned in the illegal sale of controlled substances on May 9 and 11, 2007. The deposits of

cash from fraudulent prescriptions continued into the account after the predecessor account was closed. During this same period, Scott paid cash for illegal prescriptions. For example, on May 9 and May 11, 2007, Scott purchased 28 illegal prescriptions for approximately $39,200. On May 12, 2007, a cash deposit of $19,500 was made to Account Number *0160. Bank records show similar transactions occurring frequently between February and May 2007. The Michigan Automated Prescription Service (MAPS) data shows that on 29 separate days, approximately 333 prescriptions were filled using unassigned DEA number BD9374911; the government attributes the frequency to Scott's presentation of fraudulent prescriptions filled by Riozzi. Scott paid approximately $1,400 for each prescription or approximately $466,200 for 333 prescriptions. Safescript Pharmacy BestBank Account Number *0160 records show cash deposits made on or near the day of each transaction involving illegal prescriptions.

(2) *BestBank account ending in 8558 ($19,936.77) — Safescript's checking account out of which payroll is paid.* According to the records, this account received between 33% and 95% of its funds from transfers from Safescript Pharmacy BestBank Account Number *0160 and Safescript Pharmacy BestBank Account Number *2677 since August 2007.

(3) *Countrywide Bank account ending in 5890 ($101,703.10) — Carson's interest-bearing savings account.* The government alleged and bank records established an internet transfer of $100,000.00 from BestBank Account Number *2677 to BestBank Account Number *8558. On October 16, 2007, a check made payable to Ronald G. Carson for $100,000.00 from BestBank Account Number *8558 was endorsed by Carson and deposited into BestBank Account Number *7438. On or about October 19, 2007, Carson transferred $100,000.00 via wire transfer from BestBank Account Number *7438 to Countrywide Bank Account Number *5890. These transactions involved illegal drug sales proceeds and were intended to disguise and conceal the true nature and source of the [illegal drug sales] proceeds, and thus constituted money laundering.

(4) *Comerica Bank account ending in 0766 ($19,912.07) — Carson's personal checking account.* The government alleges that this account received deposits made payable to Carson amounting to $62,197.39 from BestBank Account Number *8558. The memo section indicates that the deposits were paychecks. However, Carson is not an employee of Safescript Pharmacy. These transactions involved [fraudulent drug sales] proceeds and were intended to disguise and conceal the true nature and source of the [fraudulent drug sales] proceeds, and thus constituted money laundering.

(5) *Countrywide Bank account ending in 7528 ($51,317.06) – Gianoplos and Carson's joint savings account.* The government alleges and records establish that this account was opened on July 19, 2006 in the names of Carson and Gianoplos. Between July 2006 and November 2007, $41,250.00 was deposited via wire transfer into this account from Comerica Bank Account Number *0766. Some or all of these deposits constitute transactions involving fraudulent prescription sales proceeds involved in money laundering to disguise their true nature and origin.

The parties agree that the cash in these accounts represent proceeds of the illegal activity that was conducted at Safescript Pharmacy.

### D.  H.D. Smith's Involvement with Safescript

Safescript was a retail pharmacy that began purchasing generic pharmaceuticals, including controlled substances, from Smart Source, an H.D. Smith affiliate, sometime prior to 2006.  Smart Source was a telemarketing company; accounts serviced through that company typically placed small telephone orders for generic drug products.  SafeScript continued that relationship with H.D. Smith until it was designated as a primary account of H.D. Smith on June 29, 2006.

Around February 14, 2006, Daniel Roberts, a sales representative for H.D. Smith, met with Stacy Gianoplos at Safescript to discuss converting Safescript from Smart Source to an H.D. Smith primary account.  On June 15 and 16, 2006, Roberts met with Gianoplos at Safescript again to continue those discussions.  At that time, Gianoplos completed the necessary documents, which included a detailed customer profile, and Roberts completed his due diligence investigation of the pharmacy.

Roberts testified at deposition that he never witnessed any suspicious conduct or activity indicative of criminal activity while at Safescript on any of those occasions, and the government has no evidence that Roberts observed any such conduct or activity that would have been indicative of criminal activity.  Roberts determined that the pharmacy had a valid DEA license, had no Internet pharmacy operations, was serving doctors who had valid DEA licenses, and was located in a strip mall with good tenants in an upscale suburb of Detroit, Michigan.

Roberts also visited Gianoplos at Safescript and conducted an in-person site inspection on July 27, 2006 and December 20, 2007.  H.D. Smith has produced records of an additional visit by

-8-

Roberts on February 9, 2007.  Roberts testified that he did not monitor the nature or volume of controlled substance purchases by Safescript, deferring instead to the company's compliance officer to conduct that task.

Safescript purchased products from H.D. Smith on account.  Safescript executed a security agreement conveying to H.D. Smith a security interest in all its fixtures, equipment, accounts, and proceeds.  Thereafter, Safescript's orders were submitted to and shipped from the Springfield, Illinois Division of H.D. Smith.

H.D. Smith ceased doing business with Safescript on April 11, 2008, immediately after the government seized Safescript's bank accounts.  At that time, Safescript owed H.D. Smith $540,049.10 for products it received, but for which H.D. Smith has never been paid.  The financing agreement between Safescript and H.D. Smith called for interest on the unpaid balance to accrue a contractual rate of 18% per year.  The balance owed to H.D. Smith at the time of trial was $921,886.89.

### E.  H.D. Smith's monitoring system

As mentioned earlier, the DEA's regulations require drug wholesalers to "design and operate a system to disclose to the registrant suspicious orders of controlled substances."  21 C.F.R. § 1301.74(b).  The regulations do not prescribe any particular form or style of monitoring system.

Throughout all of 2006 and 2007, at the end of each month, the Operations Manager of the Springfield, Illinois distribution facility manually reviewed customer orders for the previous month to determine whether any of those orders were unusual or suspicious.  The use of a manual monitoring system is not a *per se* ineffective or unacceptable method of identifying suspicious

orders, and prior to this litigation, H.D. Smith's manual monitoring system had never been found to have been in violation of 21 C.F.R. § 1301.74 or any other DEA law or regulation.

DEA Investigator Scott Garriott testified that during a regulatory investigation he conducted at the Springfield distribution facility in late August and early September 2006, he suggested to H.D. Smith personnel that the company should automate their suspicious order monitoring system. Garriott explained that the manual system required the exercise of subjective judgment as to whether an order was suspicious, and an automated system would more objectively track volumes and patterns of orders.  Garriott subsequently drafted a report of investigation dated December 5, 2006, which set forth various regulatory violations and concerns identified during the course of the inspection.  He mentioned in that report that H.D. Smith should explore an automated system to monitor suspicious orders of controlled substances because of human error and issues with personnel changes attendant to a manual system.

However, Garriott's report did not cite H.D. Smith for any violations of 21 C.F.R. § 1301.74 with respect to H.D. Smith's suspicious order monitoring system.  On or about February 5, 2007, Gary G. Olenkiewicz, special agent in charge of the DEA's Chicago field office, sent correspondence to H.D. Smith, which is known as a "letter of admonition," detailing the regulatory violations of  the Controlled Substances Act that were identified during Garriott's August 2006 regulatory inspection.  The DEA's letter of admonition did not indicate that H.D. Smith's suspicious order monitoring system violated  21 C.F.R. § 1301.74 or that it was otherwise deficient in any manner.

Sometime in 2007, H.D. Smith began developing an automated suspicious order monitoring system, referred to as Controlled Substance Order Monitoring Program ("CSOMP"), to replace the

manual process that had been implemented to identify suspicious orders.  At some point in March 2008, an automated system to identify suspicious orders was fully implemented at the Springfield Division.  An automated system had been Beta tested and used on at least one occasion prior to that time.

According to the regulations, if a suspicious order is detected, the registrant's obligation is to "inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  21 C.F.R. § 1301.74(b).  The government offered testimony that the DEA sought to expand drug wholesalers' obligations by a policy change in 2006 and 2007, although there was never a change to the regulations.  One of the changes in interpretation by the DEA concerned the circumstances under which a distributor should suspend shipments to a customer if it identified an order as suspicious.  That change in policy apparently prompted concern within the DEA compliance sectors that confusion would result, since the prior "report-only" policy had been in place for 35 years.  Therefore, DEA personnel began to conduct distributor briefings to familiarize drug wholesalers with the new policy.  Kyle Wright, the unit chief of the e-commerce section at the Office of Diversion Control at the DEA Headquarters in Washington D.C. in 2006 and 2007, testified that he played an important role in developing the briefings.  He shared his work via e-mail with other DEA personnel.  The evolution of the policy and the corresponding briefings, however, are not available because Wright, remarkably, deleted all his e-mails even after this lawsuit was commenced and Wright was called upon to respond to discovery.

In all events, Wright testified that the DEA was aware that it was standard practice in the industry to file suspicious order reports while continuing to ship products, and that practice had been

-11-

approved by the DEA.  Garriott testified that he knew that it was H.D. Smith's practice to routinely

ship products after filing a suspicious order report.

On January 4, 2006, Kyle Wright gave his first distribution briefing to representatives of

H.D. Smith, the purpose of which was to address the problem of Internet sales of controlled

substances as identified to the DEA.  Wright's supervisor, Michael Mapes, told distributors at the

DEA's Pharmaceutical Industry Conference on September 11, 2007 that the DEA's new

interpretation of the suspicious order regulation was that distributors should suspend shipments if

they "routinely report suspicious orders with reason to believe they are destined for the illicit

market."  Mapes informed Wright of that policy interpretation as well.  George Euson, H.D. Smith's

Director of Corporate Compliance and Security from January 1, 2006 to April 11, 2008, attended

that conference and testified that he relied on Mapes' statement.  Wright also acknowledged that

what he had communicated to Euson at H.D. Smith distributor briefings he hosted was the same

policy that Mapes communicated at the September 2007 conference.  Wright said he gave H.D.

Smith a second briefing on October 10, 2007 and conveyed the same information.  Euson testified

that he believed that the DEA's policy was that the distributor should only suspend shipments if it

believed illegal activity was occurring with a customer.

H.D. Smith filed suspicious order reports with the DEA on various occasions concerning

orders placed by Safescript Pharmacy.  Robert Denta, the Operations Manager of the H.D. Smith's

Springfield, Illinois distribution from January 1, 2006 to January 1, 2007, filed a suspicious order

report at the end of March, 2006, after conducting his month-end review of customer orders and

seeing that Safescript purchased 3,700 dosing units of 80mg oxycodone.  Denta testified that he

believed the amount of oxycodone purchased by Safescript in March 2006 was large for a Smart

-12-

Source customer because Smart Source accounts typically only place small orders of generic products over the phone. Garriott forwarded Denta's suspicious order report to DEA investigators in the Detroit Field Office, which had geographic jurisdiction for Safescript. The DEA did not open an investigation into Safescript at that time. Denta filed a second suspicious order report on a Safescript order after his month-end review in April 2006. The report did not mention oxycodone; the volume of purchase of that drug was 1000 dosing units, which Denta did not believe was suspicious. Denta did not believe that any of the purchases identified in the April 2006 suspicious order report were an indication that criminal activity was occurring at Safescript. Garriott acknowledged receiving and reviewing that report, and he also did not believe the volumes of purchases reflected in the report indicated a high probability of criminal activity occurring at Safescript. Garriott sent a copy of the report to DEA investigators in the Detroit Field Office, who also did not open an investigation into Safescript.

George Euson testified that in December 2007, a test run of H.D. Smith's new automated suspicious order monitoring system identified sales of OxyContin to Safescript between November 6, 2007 to December 6, 2007 that were excessive. Euson reviewed the results of that test run and instructed Scott Hebisen, who replaced Denta as Operations Manager of the Springfield distribution center in January 2007, to file a suspicious order report regarding Safescript with the DEA and told Roberts to conduct an in-person due diligence investigation of the pharmacy itself.

H.D. Smith regularly filed suspicious order reports with the DEA on other pharmacies, including ten separate reports between January 1, 2006 and April 11, 2008. Denta testified that Garriott complimented him on the company's regular practice of submitting suspicious order reports

-13-

during the company's routine regulatory investigation in August 2006, after Garriott had received two reports related to Safescript.

Neither Garriott nor any other representative of the DEA directed H.D. Smith to suspend any shipments to Safescript or take any other action in response to the March or April 2006 or December 2007 suspicious order reports, and at no time did H.D. Smith suspend or discontinue its shipment of products to Safescript, including those identified as suspicious.  The parties agree that at all times relevant to this case, neither the DEA nor its officers, employees, or agents told registrant suppliers whether to ship or not ship a specific order or orders of a specific product or products even if the order or orders had been identified as suspicious.

### F.  Safescript's purchases of OxyContin and oxycondone

Safescript was a high volume        seller  of  the pain medications OxyContin and oxycondone.  The Customer Profile that Stacy Gianoplos completed in December 2007 indicated that Safescript was a retail pharmacy, that Safescript's purchases from H.D. Smith consisted of 90% controlled substances, and that 900 out of 1140 of the prescriptions dispensed by Safescript per month were written by three doctors.  Roberts testified that he understood Safescript to specialize in serving patients of pain clinics.

According to the records, it appears that over the 27 months during which H.D. Smith did business with Safescript, OxyContin sales were nil from January 2006 to June 2006 and were unremarkable until February 2007, with a substantial spike in sales in March through May 2007, continuing at a high level through March 2008.  Sales of oxycodone peaked in August 2006 and again in March 2007, but disappeared in May 2007.  The dosing unit summary is as follows:

Oxycondone

| Month | Tablets |
| --- | --- |
| January 2006 | 1,800 |
| February 2006 | 2,000 |
| March 2006 | 3,700 |
| April 2006 | 1,000 |
| May 2006 | 1,800 |
| June 2006 | 2,600 |
| July 2006 | 3,900 |
| August 2006 | 5,400 |

OxyContin

| Month | Tablets |
| --- | --- |
| January 2007 | 1,400 |
| February 2007 | 2,400 |
| March 2007 | 17,600 |
| April 2007 | 24,400 |
| May 2007 | 18,200 |
| June 2007 | 12,600 |
| July 2007 | 13,200 |
| August 2007 | 13,200 |
| September 2007 | 15,000 |
| October 2007 | 16,800 |
| November 2007 | 14,400 |
| December 2007 | 16,400 |

Drug wholesalers are required to report information on sales of controlled substances to the DEA. The reported information is collected in the Automation of Reports and Consolidated Orders System (ARCOS), which is a database that houses controlled substance activity as reported by DEA-registered manufacturers and distributors. June Howard, a DEA analyst, testified that James Rafalski asked her to prepare a ranked listing from ARCOS data of the top 25 pharmacy purchasers from H.D. Smith Wholesale Drug Company of 80 milligrams OxyContin and generic oxycodone tablets during the period from January 1, 2006 to April 11, 2008. Her report focused only on H.D. Smith's Springfield distribution center.

Howard's report indicated that Safescript's purchases of OxyContin and oxycodone dosing units far exceeded the volume purchased by the next highest pharmacy customer of H.D. Smith's top 25 customers dealing with the Springfield distribution center. The total purchases over the 27-month period was approximately nine times the volume of the next highest purchaser. Between January and August 2006, and between January 2007 and April 2008, Safescript's monthly purchases of OxyContin and oxycodone were higher than any other customer at the Springfield distribution center.

George Euson testified that although the percentage of controlled substances identified in Safescript's customer profile that was being purchased by Safescript was higher than other Springfield division customers, it was not unusual or suspicious to Euson because he was familiar with customers of other H.D. Smith divisions that specialized in serving pain clinics, like Safescript, who had similar controlled substance buying percentages. Euson testified that Safescript was not even among the top 25 purchasers of oxycodone or OxyContin for all H.D. Smith customers nationally during the same time period analyzed by Howard. Additionally, Safescript was

-16-

purchasing a wide variety of noncontroversial controlled and noncontrolled substances, such as Paxil, Lipitor, Clarinex, Wellburtrin, Prevacid, and Allegra-D, among others.

### G. Factual conclusions

The government contends that H.D. Smith cannot sustain its burden of showing it is an innocent owner of the cash accounts because it violated regulations, DEA policies, and its own internal policies by not suspending shipments of OxyContin and oxycondone to Safescript Pharmacy.  The evidence certainly establishes that H.D. Smith was lax in its monitoring of Safescript's controlled substance orders and that it could have done a far better job of monitoring.

For example, agent Rafalski testified that after H.D. Smith filed a suspicious order report for March 2006, it did nothing to look into why the amount (3,700 units of 80 mg oxycodone) was identified as suspicious.  George Euson testified that all H.D. Smith did in terms of due diligence in 2006 and 2007 with respect to suspicious orders was report them to the DEA.  Of course, that is all the regulation requires.

H.D. Smith had a written compliance policy in place before 2006.  It apparently was drafted by then-company president Henry Dale Smith, Jr.  But although some of the employees testified that they had seen the document, it was not widely disseminated.  The Controlled Substance Monitoring Statement states that if a suspicious order is discovered by a picker it shall be brought to the attention of the Controlled Substances Coordinator, and that the local DEA office should be contacted before the order is shipped, and in no event later than the next day.  The policy also counsels consultation with the local DEA office for guidance.  Denta testified that although he had not seen the controlled Substances Coordinator statement (Jnt. Tr. Exh. 210) prior to his June 21,

-17-

2011 deposition, it accurately described his responsibilities as Operations Manager and Controlled Substances Coordinator.

Other employees and former employees of H.D. Smith, including Hebisen, Steven Wasser, Edwin Brewton, and Rhonda Folkerts, testified they had not seen or did not recall seeing either of the policy statements. Vice-President and Springfield Division Manager John Olejar stated that he never saw either statement.

It does not appear that anyone at H.D. Smith contacted the DEA before shipping an order to Safescript (or anyone else) that had been identified as suspicious. That conduct violated H.D. Smith's own internal policy.

Picker Edwin Brewton testified that he should have spotted the increase in orders for 80 mg oxycodone from 1,800 in February 2006 to 3,700 units in March 2006, but did not. Hebisen also testified that a picker should have reported the increase in orders for 80 mg OxyContin from February 2007 (2,400 dosage units) to March 2007 (17,600 units) to him as suspicious, both according to H.D. Smith's standard procedures and common practice. Hebison admitted that through an effective, historic review of purchase orders he would have caught the increases in the orders of 80 mg OxyContin from Safescript from and after March 2007 through November 2007.

Olejar testified that sometime during the summer of 2007 George Euson conducted an internal audit of the Springfield distribution facility and that, as a result, Olejar identified Safescript as a pharmacy of concern. There appears to be no evidence in the record that anyone at H.D. Smith was aware of the large volume and frequency of shipments of 80 mg OxyContin to Safescript commencing in March 2007 until the internal audit was conducted and Safescript was brought to Olejar's attention. Despite Olejar communicating his concerns to his colleague, Ronda Folkerts,

-18-

who was acting in his stead on the eve of his departure sometime around the first week of October 2007, nothing was done by way of due diligence until pictures of the Safescript premises were taken and a completed customer profile for Safescript was obtained in late December 2007 during one of Roberts's site visits to Safescript.

However, the violation of a regulatory provision does not amount to a forfeiture of the right to make a claim as an innocent owner. More so, the failure to follow the DEA's interpretation of a regulation that extends beyond its plain language does not justify an inference that a wholesale drug supplier has knowledge of a customer's illegal activity or necessarily constitute deliberate action to avoid learning about such activity. The most the government has shown is that H.D. Smith was negligent, albeit on several occasions, about monitoring or acting on suspicious customer orders.

For their part, H.D. Smith has offered credible explanations why the spikes in OxyContin and oxycondone orders did not provoke suspicious order reports or provoke action to suspend shipments to Safescript. With respect to Daniel Roberts, the sales representative with hands-on contact with Safescript Pharmacy and sole responsibility for Safescript's account, there is no evidence that he had actual knowledge or subjective suspicion of any nefarious activity at Safescript. Although he conceded that he did not specifically monitor the sales of controlled substances to Safescript, he explained that he did not consider it his task to do so. Therefore, he did not know about the spike in Safescript's orders of oxycodone around February 2007 or March 2007. And to the extent the government alleges he should have been alarmed by sizeable orders from Safescript from the beginning, Roberts's explanation — that he deemed the orders legitimate given the proximity of several pain clinics — is plausible. Roberts testified that at the time Safescript

-19-

converted to a primary account, Gianoplos told Roberts that Safescript was interested primarily in purchasing oxycodone-family products from H.D. Smith because Safescript marketed itself to doctors at several pain clinics near the pharmacy, who prescribed large volumes of pain medicine. Before opening the primary account for Safescript, Roberts confirmed that there were at least ten pain clinics near Safescript's location. As the Court stated in an earlier filing, at most Roberts might have been negligent in failing to inquire into Safescript's distribution of Schedule II and III drugs, but a showing of negligence alone will not support a finding of willful blindness. *See United States v. Hoffman*, 918 F.2d 44, 46-47 (6th Cir. 1990).

H.D. Smith also has offered plausible explanations why, when it saw several spikes in Safescript's orders of controlled substances, it did not report all of them to the DEA. As noted, although H.D. Smith filed a suspicious order report in March and April 2006 and then again in November 2007, it did not file similar reports for other spikes in July or August 2006, April 2007, or other months when Safescript's orders of controlled substances increased dramatically. The records show that between January 1 and November 30, 2006, Safescript purchased a range between 700 and 5,400 dosing units of oxycodone 80mg tablets from H.D. Smith each month. In December 2006, Safescript purchased no orders of oxycodone or OxyContin.

In July 2006, Safescript purchased 3,900 dosing units of oxycodone 80mg, and in August 2006, Safescript purchased 5,400 dosing units of oxycodone 80mg from H.D. Smith. Safescript purchased higher quantities of oxycodone 80mg in July and August 2006 than it did in March 2006, which Denta previously reported to the DEA as a suspicious order. However, Denta did not report the July and August 2006 orders to the DEA as suspicious, he said, because he did not believe that the July and August 2006 orders were indicative of a high probability of criminal activity occurring

-20-

at Safecript.  Denta explained that he was expecting to see increases in the purchases of oxycodone by Safescript in both those months, so the quantities in July and August 2006 were not unusual or suspicious to him.  He said that his expectations were based on the fact that H.D. Smith was conducting its regular summer promotion at that time, which provided discounts on generic products, including oxycodone, and all customers' purchases of generic products increased during that period of time.  Denta also said he was aware that on June 16, 2006, Safescript had transitioned from a Smart Source account to a primary retail account and therefore, he expected to see its purchases of all products increase as is required for all primary account holders.

Denta acknowledged that he understood that after conducting his month-end review of customer orders, it was part of his job responsibilities to report orders that he deemed to be excessive, unusual, or too frequent to the DEA each month.  The Court is convinced that Denta's failure to report those orders to the DEA was not deliberate.  Moreover, the government has acknowledged that reports filed with the DEA under 21 C.F.R. § 1301.74 are not necessarily indicative of criminal activity.

The evidence also shows that H.D. Smith was unaware that throughout much of 2006 Anda Pharmaceuticals, another national pharmaceutical wholesaler, was supplying Safescript with over 15,000 dosing units of oxycodone and OxyContin per month, and over 20,000 dosing units of oxycodone and OxyContin the last four months of 2006.  Investigator Rafalski testified that Anda never filed a suspicious order report regarding Safescript and continued to supply Safescript with controlled substances after the April 2008 seizure.  Rafalski has acknowledged that Anda was in a better position than H.D. Smith to identify potential criminal conduct at Safescript, and yet they

-21-

never did so, and the DEA has never initiated civil or administrative action against the company for failing to do so.

In January 2007, Safescript began purchasing OxyContin 80mg each month from H.D. Smith, and between February and March 2007, Safescript's purchases of OxyContin increased from 2,400 dosing units a month to 17,600 dosing units. Scott Hebisen testified that he did not report that increase as suspicious to the DEA because he did not believe the March 2007 order was indicative of a high probability of criminal activity occurring at Safescript. Hebisen explained that under the terms of a settlement agreement between Purdue Pharma L.P. and Endo Pharmaceuticals, Inc., Endo was prohibited from manufacturing and selling generic oxycodone after December 31, 2006, and that product was no longer available to retail pharmacies such as Safescript once the supply in the wholesale market was depleted. Roberts and Euson both testified that as a result of the Purdue-Endo settlement, purchases of OxyContin dramatically increased for all customers who previously purchased the generic version of oxycodone, which was no longer available on the market.

Another factor explaining to H.D. Smith's personnel the spike in OxyContin purchases in March 2007 was Roberts's contact with Stacy Gianoplos. Euson testified that despite converting to primary retail customer statue in June 2006, Safescript failed to meet its volume purchasing obligations under its Purchase Agreement with H.D. Smith. Roberts visited Gianoplos at Safescript on February 9, 2007 to urge her to comply with the purchasing requirements, and as a result of the Purdue-Endo settlement and Roberts visit to Safescript, H.D. Smith expected the sharp increase in orders that occurred in March 2007. Hebisen testified that he was aware of those factors when deciding not to submit a suspicious order report in March 2007. The Court finds that explanation to be plausible as well.

-22-

Those explanations undermine the inference that H.D. Smith personnel had knowledge of a high likelihood that Safescript was diverting controlled substances to an illegal market. In addition, it appears that DEA personnel did not view the order pattern at Safescript to be indicative of illegality, either. Garriott testified that none of the volumes of oxycodone or OxyContin purchased by Safescript in the three suspicious order reports that he received from H.D. Smith indicated to him that there was a high probability of criminal activity occurring. And Garriott testified that he believed he had no obligation to investigate or follow up on any of those reports.

James Rafalski analyzed all of the invoices for products ordered by Safescript from H.D. Smith from January 1, 2006 to April 11, 2008 and testified, based on his analysis of those invoices, that neither the volume nor frequency of oxycodone and OxyContin purchases by Safescript indicated a high probability of criminal activity occurring at Safescript. Similarly, before conducting a distributor briefing with H.D. Smith on October 10, 2007, Kyle Wright performed his own detailed analysis of ARCOS data to identify H.D. Smith customers whom he believed needed additional scrutiny based on unusual or suspicious ordering patterns. Wright's analysis included all customers who ordered oxycodone or OxyContin products from the Springfield division from January through July 2007. Wright did not identify Safescript as a problem customer.

Further, James Rafalski, the DEA's lead case agent, testified that he was not aware of any evidence, direct or circumstantial, that H.D. Smith or any of its employees had knowledge of a high probability of the criminal activity that he was investigating at Safescript. Scott Garriott testified similarly. George Euson, vice president and division manager John Olejar, Robert Denta, and Scott Hebisen all testified that they were not aware of any facts that led them to believe that Safescript was involved in any criminal activity. Both James Rafalski and Scott Garriott testified that they were

-23-

not aware of any evidence that H.D. Smith ever deliberately ignored signs of criminal activity involving Safescript or deliberately tried to avoid learning of evidence of criminal conduct at Safescript.

Moreover, H.D. Smith had no knowledge that the FBI and the DEA had been investigating Safescript for the two years prior to the seizure of the Safescript bank accounts. None of the information that triggered or was obtained throughout the course of the investigation was provided to H.D. Smith by the DEA or the FBI before April 11, 2008. The lack of sharing information certainly is typical in government investigations of this type. But it underscores the conclusion that H.D. Smith personnel were unaware of the criminality occurring at Safescript Pharmacy. In fact, as of the date of trial, neither Gianoplos nor Carson had been indicted for their knowledge and complicity in the prescription mill conspiracy.

The Court concludes, therefore, that H.D. Smith had no knowledge of illegal activity occurring at Safescript Pharmacy, did not deliberately ignore signs of illegal activity at the pharmacy, and did not believe that there was probability of criminal activity occurring at Safescript until April 11, 2008 when the government seized Safescript's bank accounts. Upon learning of the seizure, H.D. Smith suspended all shipments of controlled substances and terminated its vendor's relationship with Safescript.

## II. Conclusions of law

Assets, including cash, that are the proceeds or are derived from proceeds traceable to a violation or violations of 21 U.S.C. §§ 841(a)(1) and 841(a)(2) (Illegal Distribution of a Controlled Substance), 21 U.S.C. § 843(a)(2) (Use of a Fictitious Registration Number in the Distribution of a Controlled Substance), or 21 U.S.C. § 846 (Conspiracy); or were involved in a transaction or

attempted transaction in violation of 18 U.S.C. §§1956(a)(1)(A)(i) (Promotional Money Laundering), or 1956(a)(1)(B)(ii) (Money Laundering to Disguise and Conceal) may be seized and forfeited to the United States.  18 U.S.C. § 981(a)(1)(A); 21 U.S.C. § 881(a)(6), (b).  Under the Civil Asset Forfeiture Reform Act (CAFRA), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. § 983(c)(1).  The parties agree and the Court finds that the following bank accounts constitute such assets that were derived from or are proceeds of such illegal conduct and are subject to forfeiture:

      (1) BestBank account ending in 2677 ($463,497.72)
      (2) BestBank account ending in 8558 ($19,936.77)
      (3) Countrywide Bank account ending in 5890 ($101,703.10)
      (4) Comerica Bank account ending in 0766 ($19,912.07)
      (5) Countrywide Bank account ending in 7528 ($51,317.06)

"The government can acquire through forfeiture no greater interest than that held by the defendant at the time the criminal acts were committed."  *United States v. Jones*, 502 F.3d 388, 392 (6th Cir. 2007).  A perfected security interest in a business's assets may take priority over the government's claim to assets through forfeiture.  H.D. Smith Wholesale Drug Company, Inc. has a valid and perfected security interest in the bank accounts and has made a claim for the cash in those accounts under 18 U.S.C. § 983(a)(4).  The Court has jurisdiction over this action.  28 U.S.C. § 1331.

"An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).  "With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place," an "innocent owner" is "an owner who — (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such

use of the property." 18 U.S.C. § 983(d)(2)(A). "With respect to a property interest acquired after the conduct giving rise to forfeiture has taken place," an "innocent owner" includes one "who, at the time that person acquired the interest in the property . . . did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A)(ii). "The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1); *see also United States v. Lots 12, 13, 14, & 15*, 869 F.2d 942, 948 (6th Cir. 1989).

"The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [fact finder] of the fact's existence." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring)) (quotation marks omitted).

An innocent owner is "one who *either* lacks knowledge of the illicit activities giving rise to the forfeiture, *or* who has knowledge of the activity but has evinced his lack of consent by affirmatively attempting to stop it." *United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379, 1382 (S.D. Fla. 2003) (emphasis added). Actual, rather than constructive, knowledge of the wrongdoing is required to rule out the defense. *See United States v. $4,255,000 in U.S. Currency*, 762 F.2d 895, 906 (11th Cir. 1985) (holding that, under 21 U.S.C. § 881(a)(6), the application of the innocent owner defense "turns on the claimant's actual knowledge, not constructive knowledge"); *United States v. $10,694.00 in U.S. Currency*, 828 F.2d 233, 234-35 (4th Cir. 1987) (stating that "§ 881(a)(6) envisions an actual knowledge inquiry"), *overruled on other*

-26-

*grounds by United States v. Walker*, 889 F.2d 1317 (4th Cir. 1989) (en banc)); *United States v. Real Property at 2659 Roundhill Drive*, 283 F.3d 1146, 1152 n.8 (9th Cir. 2002) (requiring actual knowledge); *United States v. $175,260 in U.S. Currency*, 741 F. Supp. 45, 48 (E.D.N.Y. 1990) (same); *but see United States v. Real Property Located at 10936 Oak Run Circle*, 9 F.3d 74, 76 (9th Cir. 1993) (leaning towards a constructive-knowledge approach and holding that "innocence is incompatible with knowledge that puts the owner on notice that he should inquire further").

Actual knowledge can be proven by circumstantial evidence. *See One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d at 1383 (noting that a property owner "may not 'turn a blind eye' toward [evidence of drug involvement] and still claim 'innocent owner' status under CAFRA"). In addition, "a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact." *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000). CAFRA did not eliminate willful blindness from the innocent owner analysis. *See, e.g., One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d at 1382-83; *United States v. 2001 Honda Accord Ex VIN # 1HGCG22561A035829*, 245 F. Supp. 2d 602, 611 & n.8 (M.D. Pa. 2003) (noting that the innocent owner defense under CAFRA does not have a provision expressly mentioning willful blindness, but nevertheless applying pre-CAFRA willful blindness standard). Proof of willful blindness includes "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, --- U.S.  ---, ---, 131 S. Ct. 2060, 2070 (2011).

The parties have stipulated that no H.D. Smith employee had actual knowledge of the illegal activity at Safescript Pharmacy involving diversion of controlled substances for illegal purposes. The Court has found that no H.D. Smith employee had a subjective belief of a high probability that

-27-

Safescript Pharmacy was diverting controlled substances for illegal purposes. The Court concludes, therefore, that H.D. Smith was not willfully blind to the conduct giving rise to the seizure and forfeiture of the assets of Safescript Pharmacy either before or after it acquired its interest in the property. Claimant H.D. Smith, therefore, has sustained its burden of proving that it is an innocent owner of its interest in the assets subject to forfeiture within the meaning of 18 U.S.C. § 983(d)(2)(A) and 18 U.S.C. § 983(d)(3)(A)(ii).

## III. Conclusion

Claimant H.D. Smith is entitled to judgment in its favor in the amount of $606,450.29 plus the actual interest that has accrued in the interest-bearing Seized Asset Fund since July 27, 2011 plus imputed interest in accordance with 28 U.S.C. § 2465(b)(1)(C)(ii).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 30, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 30, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---